1

2

3

4

5

6

7

8          **UNITED STATES DISTRICT COURT**

9          **EASTERN DISTRICT OF CALIFORNIA**

10

11   HWA SUNG SIM,                          ) Case No. 1:16-cv-01051-SAB (PC)
                                            )
12                      Plaintiff,           )
                                            ) ORDER REGARDING DEFENDANTS' MOTION
13          v.                               ) FOR SUMMARY JUDGMENT
                                            )
14   MONICA DURAN, et al.,                   ) [ECF No. 50]
                                            )
15                      Defendants.          )
                                            )
16   _____)

17          Plaintiff Hwa Sung Sim is appearing in forma pauperis in this civil rights action pursuant to 42

18   U.S.C. § 1983.  Pursuant to 28 U.S.C. § 636(c), both parties have consented to the jurisdiction of the

19   United States Magistrate Judge.  (ECF Nos. 7, 17.)

20          Currently before the Court is Defendants Dr. Patel and Dr. Johal's motion for summary

21   judgment, filed October 15, 2018.

22                                    **I.**

23                          **PROCEDURAL HISTORY**

24          This action is proceeding against Defendant Duran for excessive force and against Defendants

25   Johal and Patel for deliberate indifference to a serious medical need in violation of the Eighth

26   Amendment.

27          On February 21, 2018, Defendants Duran and Johal filed an answer to the second amended

28   complaint.  (ECF No. 32.)

                                    1

On April 16, 2018, Defendant Patel filed an answer to the second amended complaint. (ECF No. 40.)

As previously stated, on October 15, 2018, Defendants Johal and Patel filed a motion for summary judgment.[1] (ECF No. 50.) Plaintiff filed an opposition on November 4, 2018, and Defendants filed a reply and objections on November 27, 2018.

## II.

### LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

///

///

---

[1] Defendant Duran did not move for summary judgment on Plaintiff's excessive force claim.

**III.**

**DISCUSSION**

**A.      Summary of Plaintiff's Second Amended Complaint**

On or about Sunday, August 31, 2014 at 1004 hours a Code 1 was activated in Facility "A" dining hall B-side at Wasco State Prison due to five inmates battering another inmate, and correctional officers ordered all inmates to get down inside the B-side dining hall.  Plaintiff was present in Facility "A" dining hall B-side, but was not involved in the fight and was appropriately 20 feet away from the fight.

All inmates, including Plaintiff, got down except for the inmates who continued to batter the lone inmate

Correctional Officer Hanzel then deployed his state issued MK9-OC-pepper spray, striking the five inmates who instigated the battery, but the five inmates continued the batter.

Defendant Duran then discharged her weapon, a 40MM-Penn Arm#GS0557, as it was aimed at Plaintiff's head while Plaintiff was 20 feet in the opposite direction of where the fight was occurring.  Plaintiff was on the ground when Defendant Duran's projectile from her weapon struck Plaintiff upon his head and knocked him unconscious.  Plaintiff sustained a head-wound requiring six-staples, and Plaintiff sustained a concussion, bleeding in his brain, and a traumatic brain injury.

Plaintiff still suffers from this head injury as he has nightmares reliving the incident and urinates himself, has headaches, severe migraines, and often nausea.  Plaintiff continues to suffer emotional and mental injuries from this incident, and has been diagnosed with Post Traumatic Stress Disorder.

Defendant Duran intentionally and maliciously aimed her weapon at Plaintiff, who was not involved with the fighting and on the ground as ordered, put Plaintiff within the cites of her weapon and discharged her weapon striking Plaintiff in his head.

All California Department of Correction and Rehabilitations Correctional Officers, including Defendant Duran, receive training in aiming, discharging and hitting targets with firearms and must qualify at hitting targets every 90 days.  Correctional Officers, including Defendant Duran, using a

40MM-Penn Arm#GS0557 must qualify using that firearm by being able to hit two out of three targets aimed at.

Defendant Duran during the incident knew where her weapon was aimed, at Plaintiff's head, and Defendant Duran used excessive and deadly force against Plaintiff by discharging her weapon and hitting Plaintiff in the head, all while Defendant Duran is a skilled and trained marksman with her weapon used on the date of the incident.

By firing her weapon at Plaintiff, Defendant Duran willfully violated California Department of Corrections and Rehabilitations Rules and Regulations section 3268(f) which provides in relevant part "firearms shall not be discharged if there is reason to believe that persons other than the intended target will be injured." Before discharging her weapon, Defendant Duran had the intent to hit Plaintiff in the head as no one else was injured by her discharging her firearm, thereby violating Plaintiff's civil rights from being free from cruel and unusual punishment and excessive force in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

Right after Plaintiff was shot in the head, he was taken to a hospital where he received six staples for his head wound, and Plaintiff was released within a few hours back to Wasco State Prison. Defendants Johal and Patel did not order a CT Scan for Plaintiff's head nor monitored him for a mandatory 24 hours after sustaining the head injury.

On or about September 1, 2014, Plaintiff woke up with a large amount of blood and vomit in his bed, and Plaintiff was then admitted to a hospital for a CT scan and an MRI of his brain.

On or about September 4, 2014, Plaintiff was released from the hospital and returned to Wasco State Prison. Over the next ten days, Plaintiff submitted several medical request forms for a medical evaluation by Defendants Johal and Patel because Plaintiff was suffering from dizziness, nausea, and vomiting, but Defendants Johal and Patel ignored Plaintiff's medical request forms and provided Plaintiff with no medical treatment or monitoring for those ten days. Later in September 2014, Defendants Johal and Patel examined Plaintiff and told him that he is lying about his dizziness, nausea, and vomiting, and that he is making a big deal out of nothing. Plaintiff also requested in September 2014 to Defendants Johal and Patel to be seen by an outside specialist for Plaintiff's

ongoing complaints resulting from his head injury, and Defendants Johal and Patel refused to send Plaintiff to a specialist for his head injuries.

On or about October 5, 2014, Plaintiff had a seizure in the dayroom of his building which required his admittance into a hospital. Prior to being shot in the head, Plaintiff never suffered a seizure nor did he have a history of seizures.

On or about March 2015, Plaintiff blacked out in the central kitchen in Facility "A." Prior to being shot in the head, Plaintiff had no history of blackouts.

At all relevant times, Defendants Johal and Patel failed to take the necessary steps for Plaintiff to be examined by a specialist for his head injury as to determine the cause of his seizures and blackouts.

**B.    Statement of Undisputed Facts[2]**

1.    Plaintiff Hwa Sung Sim is a former state prisoner. He was in the custody of California Department of Corrections and Rehabilitation (CDCR) and housed at Wasco State Prison during the alleged events in this action. (Sec. Am. Compl. ¶ 2, ECF No. 30.)

2.    Defendants V. Patel and A. Johal are physicians who were employed by CDCR at Wasco during the alleged events in this action. (Patel Decl. ¶ 1; Johal Decl. ¶ 1.)

3.    Plaintiff presented to Dr. Patel during the morning of August 31, 2014. He had a laceration to his left scalp and was bleeding. (Patel Decl. ¶ 8, AGO 881.)

4.    Dr. Patel conducted a clinical evaluation. Plaintiff did not report loss of consciousness, seizure, nausea, or vomiting. Dr. Patel then ordered Plaintiff's transportation to the San Joaquin Community Hospital. (Patel Decl. ¶¶ 8-9, 12; Patel Ex. A at pp. AGO 808, 881.)

5.    The ambulance drove Plaintiff to Kern Medical Center instead. Emergency room

---

[2] Because on summary judgment the evidence of the non-moving party is assumed to be true and disputed facts are construed in the non-movants favor, the Court sets forth the undisputed facts and notes those disagreements of fact that are relevant to this decision. Plaintiff disputes almost every statement of undisputed fact presented by Defendants. However, a majority of Plaintiff's objections do not actually dispute the facts as set forth by Defendants and merely add additional facts relating to his legal argument. Accordingly, the Court will not address all of Plaintiff's objections, and will only address those that have actual merit.

physicians diagnosed him with a scalp laceration. Surgical staples were applied to the wound. The physicians then cleared Plaintiff to return to prison. Their aftercare instructions include cleaning the wound one to two times a day for ten days, and to apply antibiotic ointment to the wound for two or three days. The instructions also required the wound to be covered for forty-eight hours.[3] (Patel Decl. ¶¶ 13-14; Patel Ex. A at pp. AGO 1071-1073.)

6. Plaintiff returned to the prison later that same day. Dr. Patel did not personally examine Plaintiff, but he reviewed the emergency room discharge instructions. Dr. Patel then ordered medications for Plaintiff and, in addition to those recommended by the emergency room physicians, further ordered nursing checks, neurology checks, and a follow-up appointment, and increased the prescription for antibiotic ointment. (Patel Decl. ¶¶ 13-14; Patel Ex. A at pp. AGO 809, 1071-1073.)

7. Plaintiff presented to Dr. Patel again the next morning on September 1, 2014. He complained of dizziness, vomiting, and nausea. (Patel Decl. ¶ 18; Patel Ex. A at p. AGO 876.)

8. Dr. Patel conducted a clinical evaluation of Plaintiff. He then ordered his Transportation Code III to San Joaquin Community Hospital for further evaluation and a computed tomography (CT) scan. (Patel Decl. ¶¶ 18-21; Patel Ex. A at pp. AGO 806, 876.)

9. The physicians at San Joaquin Community Hospital conducted several CT scans. On September 1, 2014, the CT scan showed Plaintiff had a mild hemorrhagic contusion in the left frontal lobe at the site of laceration. There was no fracture. There was no epidural or subdural hematoma. The following day, on September 2, 2014, the findings showed improvement with residual subarachnoid hemorrhage and contusion. There was no new bleeding. The physicians then cleared Plaintiff to return to prison. (Patel Decl. ¶ 22; Patel Ex. A at pp. 1044-1046.)

10. Plaintiff returned to Wasco on September 4, 2014. Nursing staff evaluated Plaintiff and

---

[3] Plaintiff attempts to dispute this fact by stating that at the Kern Medical Center, Plaintiff suffered from ear ringing, nausea, light headedness, headaches, throbbing, and dizziness. On August 31, 2014, at 2:20 p.m., Dr. Patel did not examine Plaintiff and signed an order, which agreed with Dr. Zardouz's general rule, that Plaintiff was to be checked on every four hours for three times, and then every six hours for three times. While Defendant Patel admits there are no records that nursing staff conducted the ordered checks on August 31, 2014, such fact is immaterial because there is no vicarious liability under section 1983. Palmer v. Sanderson, 9 F.3d 1433, 1437-38 (9th Cir. 1993). In addition, there is no evidence that Dr. Patel was aware that nursing staff failed to follow his ordered checks, and Dr. Patel declared that he believed if Plaintiff was examined by a nurse who believed his symptoms had not stabilized or worsened, then he would expect the nurse to inform him or another physician. (Patel Decl. ¶ 16.)

was diagnosed with post concussive syndrome, and ordered to be seen by a doctor within three to five days. (Patel Decl. ¶ 23, Patel Dep. at 51:19-52:16; Pl.'s Ex. 88.)

11.     Pursuant to policy and practice, inmates who return from the hospital are seen by medical staff for a follow-up appointment within three to five days. This is independent from the routine request for medical services procedures that inmates may use within their housing units. (Patel Decl. ¶ 25.)

12.     Plaintiff was evaluated by a nurse on September 8, 2014. He stated that he was not given pain medication. (Patel Decl. ¶ 27; Patel Ex. A at p. AGO 870.)

13.     Plaintiff presented to Dr. Patel on September 10, 2014. He complained that he was still vomiting. (Patel Decl. ¶ 32; Patel Ex. A at pp. AGO 868-869.)

14.     Dr. Patel examined Plaintiff on September 10, 2014, and ordered (1) medications; (2) that Plaintiff lay-in for ten days; (3) that the staples be removed by nursing staff; and (4) a follow-up appointment in ten days. (Patel Decl. ¶¶ 33-35; Patel Ex. A at pp. AGO 803-804, 868.)

15.     On September 17, 2014, Plaintiff submitted a Form 7362 request for medical services. Plaintiff complained of headaches, nausea, dizziness, and vomiting daily since August 31, 2014. (Pl.'s Ex. 73.)

16.     Plaintiff presented to Dr. Patel on September 19, 2014, for a follow-up evaluation and in response to CDCR Form 602 grievance log number WSP-HC-14047347. Plaintiff reported that he still had dizziness, nausea, and vomiting. He also exhibited signs of memory loss. Plaintiff also reported to Dr. Patel that he was not taking the previously prescribed medication for vomiting. (Patel Decl. ¶ 38; Patel Ex. A at pp. AGO 866-867, 1257, 1259, Patel Dep. at 125:15-126:10.)

17.     Dr. Patel conducted a clinical evaluation of Plaintiff on September 19, 2014. He ordered: (1) medications and (2) an accommodation chrono directing that Plaintiff have limited duties, a low bunk and low-tier cell assignment and that he should avoid working at heights. Dr. Patel also submitted a request for another CT scan. Dr. Patel then told Plaintiff to come to the pill window for his medications twice a day as needed. (Patel Decl. ¶¶ 38-41; Patel Ex. A at pp. 866-867.)

18.     Plaintiff underwent another CT scan of his brain on September 26, 2014.  The scan found no acute infraction, hemorrhage, or mass.  The scan was normal.  (Johal Decl. ¶ 9; Johal Ex. A at p. AGO 1095.)

19.     Plaintiff presented to Dr. Johal on October 1, 2014.  Plaintiff reported that he was having headaches, nausea, and vomiting.  (Johal Decl. ¶ 10; Johal Ex. A at p. AGO 864.)

20.     Dr. Johal conducted a clinical evaluation of Plaintiff and analyzed his medical history.  Dr. Johal's assessment was that Plaintiff most likely had migraine headaches.  Dr. Johal advised Plaintiff to take ibuprofen for his headaches and ordered a follow-up appointment in two weeks to check on his symptoms.  (Johal Decl. ¶¶ 10-11; Johal Ex. A at pp. AGO 799-800, 864.)

21.     Plaintiff had a possible seizure a few days later on October 5, 2014.  He was ordered to be transported to the San Joaquin Community Hospital by a non-party nurse practitioner.  (Johal Decl. ¶ 12; Johal Ex. A at pp. AGO 798, 861-863.)

22.     Plaintiff stayed at the hospital from October 5 to October 8, 2014.  While there, he had CT scans of his brain and neck.  He also had electroencephalography (EEG) testing and magnetic resonance imaging (MRI), and was evaluated by neurologists.  All of Plaintiff's diagnostic tests were normal.  (Johal Decl. ¶¶ 12-13; Johal Ex. A at pp. AGO 990-991, 992-999, 1000-1003, 1012-1015, 1023-1026, 1028.)

23.     Upon his return to Wasco, Plaintiff was evaluated by a nurse.  Dr. Patel, who was the on-call physician, also ordered medications for Plaintiff, including for seizures.  (Johal Decl. ¶ 14, Patel Decl. ¶ 42; Johal Ex. A at pp. AGO 797, 859.)

24.     Plaintiff presented to Dr. Johal on October 13, 2014.  He complained of headaches, nausea and vomiting.  Plaintiff was not taking his medication as recommended.  (Johal Decl. ¶¶ 15-16; Johal Ex. A at p. AGO 857.)

25.     Dr. Johal restarted Plaintiff's medications for seizures and started him on a new medication for his headaches.  Dr. Johal also ordered a liver function test.  (Johal Decl. ¶ 16; Johal Ex. A at pp. AGO 795, 857.)

26.     On November 4, 2014, Dr. Johal updated Plaintiff's medications.  (Johal Decl. ¶ 17; Johal Ex. A at p. AGO 892.)

27.     Plaintiff presented to Dr. Johal for another appointment on November 7, 2014.  Plaintiff continued to complain of throbbing headaches aggravated with light and dizziness while walking and in bed.  (Johal Decl. ¶ 18; Johal Ex. A at AGO 856; Johal Dep. at 121:22-122:6.)

28.     Dr. Johal conducted a clinical evaluation and an orthostatic examination.  She noted his diagnostic testing history and medication history.  She then ordered medication and submitted a request for a specialty consultation with a neurologist.  (Johal Decl. ¶¶ 18-19; Johal Ex. A at pp. AGO 790-791, 856, 956.)

29.     On December 30, 2014, Dr. Johal updated Plaintiff's medications.  (Johal Decl. ¶ 20; Johal Ex. A at p. AGO 789.)

30.     Plaintiff presented to Dr. Johal for another appointment on January 6, 2015.  He complained that he was having headaches and on-and-off nausea.  He said that his dizziness was getting better.  He denied any new symptoms.  He was not taking some of his medications on a daily basis.  (Johal Decl. ¶ 21; Johal Ex. A at p. AGO 855.)

31.     Dr. Johal conducted a clinical evaluation and analyzed his medical history.  She adjusted Plaintiff's medications, ordered laboratory testing, and ordered another follow-up with a neurologist.  (Johal Decl. ¶¶ 21-22; Johal Ex. A at pp. AGO 788, 855.)  As of January 6, 2015, Plaintiff had not yet had his neurological consult that was recommended on November 7, 2014.  (Johal Dep. at 94:24-95:22.)

32.     Plaintiff was evaluated via teleconference by a neurologist on January 21, 2015.  The neurologist recommended stopping one of Plaintiff's medications and continuing another, and advised Plaintiff to keep a diary of his headaches.  (Johal Decl. ¶ 23; Johal Ex. A at pp. AGO 957-959.)

33.     Dr. Johal adopted the neurologist's recommendations on January 26, 2015, and ordered a follow-up evaluation with Plaintiff in one month.  (Johal Decl. ¶ 24; Johal Ex. A at p. AGO 787.)

34.     Plaintiff presented to Dr. Johal for another appointment on January 28, 2015.  He complained that he continued to have on-and-off headaches that got worse when he was pushing and pulling heavy things.  (Johal Decl. ¶ 25; Johal Ex. A at p. AGO 854.)

35.     Dr. Johal conducted a clinical evaluation, including questioning whether he had syncope, i.e. lightheadedness, and analyzed Plaintiff's medical history.  Dr. Johal continued his

medications, ordered a follow-up for another consultation with a neurologist, and entered a limited-duty accommodation chrono.  (Johal Decl. ¶¶ 25-26; Johal Ex. A at pp. AGO 785-786, 854; Johal Dep. at 129:13-130:16.)

36.     Plaintiff met again with the neurologist a second time, via teleconference on March 2, 2015.  The neurologist noted that Plaintiff was not keeping the diary of his headaches and that he was not taking some of his medications.  The neurologist noted that Plaintiff had not had any blackouts since October 2014, and that even was likely either an episode of syncope (fainting) or a seizure.  The neurologist recommended a referral to a psychologist.  (Johal Decl. ¶ 27; Johal Ex. A at pp. AGO 954-955.)

37.     On March 5, 2015, Dr. Johal ordered Plaintiff to have a follow-up appointment within two weeks and to schedule a follow-up visit with the neurologist in six weeks.

38.     Plaintiff presented to Dr. Johal for another appointment on March 9, 2015.  He complained that he was experiencing headaches in the morning and primarily when he worked in the kitchen.  He was refusing to take his chronic pain medications.  (Johal Decl. ¶ 29; Johal Ex. A at p. AGO 853.)

39.     Dr. Johal conducted a clinical evaluation and analyzed Plaintiff's medical history.  She also adjusted his medication and prescribed new medication for his headaches.  She also made referral for a psychological evaluation and for an optometry appointment.  (Johal Decl. ¶¶ 29-30; Johal Ex. A at pp. AGO 782-783, 853.)

40.     On March 11, 2015, Plaintiff blacked out in the kitchen at Wasco State Prison and was found lying on the floor.  Plaintiff suffered a syncopal episode.  Plaintiff told nursing staff that he  Had stopped taking medications two weeks earlier and that he did not drink any water that day.  (Johal Decl. ¶ 31; Johal Ex. A at pp. AGO 849-850; Johal Dep. at 99:14-100:1; 133:20-134:4.)  Prior to August 31, 2014, Plaintiff did not have a history of black outs or syncopal episodes.  (Johal Dep. at 86:5-6.)

41.     Dr. Patel, the on-call physician that day, ordered Plaintiff's transportation to the San Joaquin Community Hospital.  (Johal Decl. ¶ 31; Patel Decl. ¶ 43; Johal Ex. A at pp. AGO 781, 849, 953.)

42. Plaintiff stayed at the hospital until March 13, 2015. He had repeated CT, MRI, carotid duplex ultrasound (US Carotid Duplex) testing done. He also had a neurology consultation. All of his scans were normal. (Johal Decl. ¶ 32; Johal Ex. A at pp. AGO 974, 979-987.)

43. Upon Plaintiff's return, a non-party physician ordered medication for his seizures and follow-up appointments with his primary physician and neurologist. (Johal Decl. ¶ 33; Johal Ex. A at p. AGO 780.)

44. Plaintiff presented to Dr. Johal for a follow-up appointment on March 17, 2015. He reported that he was feeling good. He denied headaches and dizziness. (Johal Decl. ¶ 34; Johal Ex. A at p. AGO 844.)

45. Dr. Johal's assessment was that Plaintiff had a syncopal episode (fainting) and migraines. She adjusted his medication and started him on a new prescription for his migraines. She further ordered a follow-up neurology consultation. (Johal Decl. ¶ 35; Johal Ex. A at pp. 778-779, 844.)

46. Dr. Johal and Dr. Patel were not responsible for Plaintiff's further treatment after his clinical visit on March 17, 2015. (Johal Decl. ¶ 36; Patel Decl. ¶ 44.)

## C. Defendants' Evidentiary Objections

### 1. Objections to Dr. Zardouz's Report

Defendants raise the following three objections to Dr. Zardouz's expert report submitted by Plaintiff: (1) unsworn hearsay; (2) relevancy as to that Plaintiff undergo an EEG test in the future; and (3) not supported by admissible evidence.

First, Defendants' argument that Dr. Zardouz's expert report should not be considered because it is unsworn is denied as moot because the parties' stipulated as to the authenticity of Dr. Zardouz's report. Second, Defendants' objection based on the relevancy of Dr. Zardouz's opinion that Plaintiff undergo an EEG test in the future, such objection is denied as unnecessary because the Court necessarily by implementation of the summary judgment standard does not consider irrelevant evidence in rendering its ruling. Third, Defendants' objection that Dr. Zardouz's report is not based on admissible evidence is incorrect because medical expert opinion may be based on a patient's testimony. However, to the extent Defendants are attempting to raise a Daubert challenge to Dr.

Zardouz's report, they have not adequately presented or briefed such argument and the Court declines to address such issue sua sponte.[4]  Nonetheless, for the reasons explained below, Dr. Zardouz's report is insufficient to create a genuine issue of material fact as to whether either Defendant was deliberately indifferent to Plaintiff's serious medical needs.

> 2.     Objection's to Plaintiff's Declaration

Defendants object to eight statements made in Plaintiff's declaration based on hearsay grounds. Defendants also object to the entirety of Plaintiff's journal entry, statement of facts, and diary notes, attached to his declaration as hearsay.

Rule 56(c)(4) of the Federal Rules of Civil Procedure states that affidavits and declarations submitted for or against a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Thus, only admissible evidence may be considered by the court.  Beyene v. Coleman Sec. Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988). Inadmissible hearsay cannot be considered on a motion for summary judgment.  See, e.g., Anheuser-Busch v. Natural Beverage Distrib., 69 F.3d 337, 345 n.4 (9th Cir. 1995)

However, in a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial."

Plaintiff's statements in his declaration as to what other non-Defendant unidentified doctors or other medical staff stated are inadmissible hearsay, and Defendants' objections as to those statements are sustained.[5]  With regard to Plaintiff's journey entry, statement of facts, and diary notes attached to his declaration, Defendants' blanket objection as to hearsay is conclusory, and the Court need not consider "boilerplate recitations of evidentiary principles or blanket objections without analysis." See Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F.Supp.2d 1023, 1033 (C.D. Cal. 2013).  Defendants did

---

[4] Under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the Supreme Court provided guidelines for determining the reliability, and thus admissibility, of expert testimony.  Id.  The Court should consider the following four factors: (1) the theory "can be (and has been) tested"; (2) the theory "has been subjected to peer review and publication"; (3) the theory has a "known or potential rate of error"; and (4) whether or not the theory or technique enjoys "general acceptance" within a "relevant scientific community."  Id. at 593-4.

[5] However, to the extent, any out-of-court statements are attributed to either Defendant, such statements are admissible and not hearsay.  Fed. R. Evid. 801(d)(2).

not specifically address the particular contents of the documents, and the Court will not comb through the documents to determine what is or what is not hearsay.  Further, Plaintiff can explain the pain and injury he sustained as a result of the shooting which is based on his personal knowledge of his bodily condition as such statements do not require specialized medical knowledge.  See Fed. R. Evid. 701-702, 803(3).

### D.    Defendants' Motion for Summary Judgment

Defendants argue that the undisputed evidence demonstrates that they were not deliberately indifferent in providing medical treatment to Plaintiff.  Defendants contend they provided Plaintiff comprehensive treatment each time he presented with a medical need.   Defendants clinically evaluated Plaintiff multiple times, ordered multiple diagnostic studies, ordered his transport to the hospital several times, referred him to specialty consultations, and prescribed different medication regimens.

In opposition, Plaintiff argues that Defendants failed to provide timely and necessary medical treatment for Plaintiff's concussion.  For instance, Defendant Patel did not medically monitor Plaintiff for the first twenty-four (24) hours after the incident.  Plaintiff argues that days and weeks after the incident, he was dizzy, nauseous, and vomited repeatedly, and proper medical observations were not performed by Defendants.

In reply, Defendants argue that Plaintiff's opposition fails to address the treatment that was provided to him by non-party hospital physicians and specialists, and their diagnostic studies, that Dr. Patel and Dr. Johal relied on.  In addition, Plaintiff received the clinical care by Dr. Patel and Dr. Johal on the dates asserted in the moving papers, which included transportation to local hospitals, multiple orders for further diagnostic studies, different medication regimens, referral to specialists, housing and job accommodations, and orders for follow-up clinical visits.

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

13

Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

A difference of opinion between a physician and the prisoner - or between medical professionals - concerning what medical care is appropriate does not amount to deliberate indifference. Snow v. McDaniel, 681 F.3d at 987, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm v. Rotman, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

1. Defendant Dr. Patel

It is undisputed that Plaintiff presented to Dr. Patel during the morning of August 31, 2014. He had a laceration to his left scalp and was bleeding. (Patel Decl. ¶ 8, AGO 881.) Dr. Patel conducted a clinical evaluation. Plaintiff did not report loss of consciousness, seizure, nausea, or vomiting. Dr. Patel then ordered Plaintiff's transportation to the San Joaquin Community Hospital. (Patel Decl. ¶¶ 8-9, 12; Patel Ex. A at pp. AGO 808, 881.) The ambulance drove Plaintiff to Kern Medical Center instead. Emergency room physicians diagnosed him with a scalp laceration. Surgical staples were applied to the wound. The physicians then cleared Plaintiff to return to prison. Their aftercare instructions included cleaning the wound one to two times a day for ten days, and to apply antibiotic

ointment to the wound for two or three days. The instructions also required the wound to be covered for forty-eight hours.[6] (Patel Decl. ¶¶ 13-14; Patel Ex. A at pp. AGO 1071-1073.)

Plaintiff returned to the prison later that same day. Dr. Patel did not personally examine Plaintiff, but he reviewed the emergency room discharge instructions. Dr. Patel then ordered medications for Plaintiff and, in addition to those recommended by the emergency room physicians, further ordered nursing checks, neurology checks, and a follow-up appointment, and increased the prescription for antibiotic ointment. (Patel Decl. ¶¶ 13-14; Patel Ex. A at pp. AGO 809, 1071-1073.)

Plaintiff presented to Dr. Patel again the next morning on September 1, 2014. He complained of dizziness, vomiting, and nausea. (Patel Decl. ¶ 18; Patel Ex. A at p. AGO 876.) Dr. Patel conducted a clinical evaluation of Plaintiff. He then ordered his transportation Code III to San Joaquin Community Hospital for further evaluation and a computed tomography (CT) scan. (Patel Decl. ¶¶ 18-21; Patel Ex. A at pp. AGO 806, 876.)

Plaintiff was evaluated by a nurse on September 8, 2014. He stated that he was not given pain medication. (Patel Decl. ¶ 27; Patel Ex. A at p. AGO 870.)

Plaintiff presented to Dr. Patel on September 10, 2014. He complained that he was still vomiting. (Patel Decl. ¶ 32; Patel Ex. A at pp. AGO 868-869.) Dr. Patel examined Plaintiff on September 10, 2014, and ordered (1) medications; (2) that Plaintiff lay-in for ten days; (3) that the staples be removed by nursing staff; and (4) a follow-up appointment in ten days. (Patel Decl. ¶¶ 33-35; Patel Ex. A at pp. AGO 803-804, 868.)

On September 17, 2014, Plaintiff submitted a Form 7362 request for medical services. Plaintiff complained of headaches, nausea, dizziness, and vomiting daily since August 31, 2014. (Pl.'s Ex. 73.)

---

[6] Plaintiff attempts to dispute this fact by stating that at the Kern Medical Center, Plaintiff suffered from ear ringing, nausea, light headedness, headaches, throbbing, and dizziness. On August 31, 2014, at 2:20 p.m., Dr. Patel did not examine Plaintiff and signed an order, which agreed with Dr. Zardouz's general rule, that Plaintiff was to be checked on every four hours for three times, and then every six hours for three times. While Defendant Patel admits there are no records that nursing staff conducted the ordered checks on August 31, 2014, such fact is immaterial because there is no vicarious liability under section 1983. Palmer v. Sanderson, 9 F.3d 1433, 1437-38 (9th Cir. 1993). In addition, there is no evidence that Dr. Patel was aware that nursing staff failed to follow his ordered checks, and Dr. Patel declared that he believed if Plaintiff was examined by a nurse who believed his symptoms had not stabilized or worsened, then he would expect the nurse to inform him or another physician. (Patel Decl. ¶ 16.)

Plaintiff presented to Dr. Patel on September 19, 2014, for a follow-up evaluation and in response to CDCR Form 602 grievance log number WSP-HC-14047347. Plaintiff reported that he still had dizziness, nausea, and vomiting. He also exhibited signs of memory loss. Plaintiff also reported to Dr. Patel that he was not taking the previously prescribed medication for vomiting. (Patel Decl. ¶ 38; Patel Ex. A at pp. AGO 866-867, 1257, 1259, Patel Dep. at 125:15-126:10.) Dr. Patel conducted a clinical evaluation of Plaintiff on September 19, 2014. He ordered: (1) medications and (2) an accommodation chrono directing that Plaintiff have limited duties, a low bunk and low-tier cell assignment and that he should avoid working at heights. Dr. Patel also submitted a request for another CT scan. Dr. Patel then told Plaintiff to come to the pill window for his medications twice a day as needed. (Patel Decl. ¶¶ 38-41; Patel Ex. A at pp. 866-867.)

Plaintiff argues that Dr. Patel was deliberately indifferent to his medical needs by not ordering a CT scan on August 31, 2014, and not ordering him to remain in Wasco's inpatient care facility for twenty-four hours of monitoring following his return from the hospital. (Pl.'s Opp'n at pp. 21-22.) Plaintiff also claims Dr. Patel was deliberately indifferent because he did not see a physician for six days after Dr. Patel ordered his second trip to the hospital, despite the institution's policy and practice for a prisoner to see a doctor within three to five days after returning from a hospital. (Pl.'s Opp'n at p. 22.) Plaintiff further argues that Dr. Patel failed to order medical monitoring despite Plaintiff's continued symptoms, and Dr. Patel told him he was lying about his symptoms and making a big deal out of nothing. (Id.)

Plaintiff submits the declaration and medical evaluation by Dr. Zardouz who opines as follows:

This is an addendum to my recent Neurological Independent Medical Evaluation report dated October 26, 2018. I have received the five-page Declaration by Hwa Sung Sim, which more specifically describes his medical condition.

Based on the information in this Declaration, it is clear that Mr. Sim had a contusion to the brain on August 31, 2014. On that day, he was transported to Kern Medical Center, where he was evaluated, but a CT scan or an MRI scan of the brain was not performed. (Per the patient's history to me and the above medical records, staples were applied to the wound on his head, and then he was discharged.)

When the patient returned to the prison, he was not kept in the CDC unit where injured prisoners are kept for observation.

I should state that as a general rule, when a patient has a head injury, it can be called a minimal traumatic brain injury, concussion/contusion, or some other synonymous terminology. These patients need to be observed every four to six hours for at least the first 24 hours after the head injury to be certain there is no change in their mental status. This was not done in Mr. Sim's case.

Per the patient's Declaration, the next day, September 1, 2014, he continued to be symptomatic while in his cell, including vomiting in his bed and blood oozing from his scalp, as well as headaches, dizziness and nausea. Therefore, he was transported to San Joaquin Community Hospital. (Per the medical records, he underwent the first CT scan of his brain on this date, and it showed abnormal findings.)

As the patient stated in his Declaration, he was still symptomatic when he returned to Wasco State Prison on September 4, 2014, but he was not examined by a doctor, and he did not receive any medication. He remained symptomatic.

It was not until September 10, 2014, that the patient was seen by a doctor in the prison. The patient was told by doctor in the prison. The patient was told by the doctor that he was "making a big deal out of nothing" and that nothing was wrong with him (as noted on Page 3 of the Declaration). Therefore, he was not given any medication on this date.

The patient was seen by a doctor again on September 19, 2014. However, he was again told that he was "making a big deal out of nothing." (as noted on Page 3 of the Declaration).

On October 1, 2014, the patient was seen by Dr. Johal due to his ongoing complaints of headaches, dizziness, nausea and vomiting. The patient was also told by Dr. Johal that there was nothing wrong with him (as noted on Page 4 of the Declaration).

Needless to say, when there is a history of concussion/contusion, patients remain symptomatic for at least one to three months and sometimes longer.

In this particular case, I can state that Mr. Sim did not receive medical care in a timely manner.

Finally, I should state that patients, such as Mr. Sim, with a history of concussion/contusion have a chance of developing neurological issues in the future, such as mood changes and sleep problems. There is also a small percentage of patients who develop seizures and/or memory issues. In the event that patients develop any of these symptoms, they require follow-up neurological assessments and testings, and at times they require more specific treatment depending on the type of symptoms they have developed.

(Pl.'s Opp'n, Ex. 87.)

In his initial report, Dr. Zardouz discussed his in-person medical examination of Plaintiff. (ECF No. 51-30 at pp. 1-9.) The medical examination also included statements by Plaintiff regarding the events at issue in this action. (Id. at pp. 2-4.) It also discussed Defendants' expert Dr. McIntire

and a review of the medical records.  (Id. at pp. 9-19.)  Dr. Zardouz then provides his impression and conclusion.  (Id. at pp. 19-21.)  However, nowhere in Dr. Zardouz's initial report does he opine that Plaintiff did not receive medical care in a timely manner.  Rather, Dr. Zardouz's opinion is made in an addendum and only after he reviewed Plaintiff's declaration submitted in opposition to Defendants' motion for summary judgment.

Defendants present the expert opinion of Dr. Steven McIntire,[7] who conducted a medical interview and evaluation of Plaintiff, reviewed his medical records and history, and opined that there was not support for the finding that Drs. Patel and Johal were deliberately indifferent to Plaintiff's serious medical needs following the injury on August 31, 2014.  (McIntire Decl. ¶ 49; ECF No. 50-3.)  Dr. McIntire further opined that the medical treatment Plaintiff received for his injury was appropriate and consistent with the accepted standard of care for such a head injury and associated neurological symptoms.  (Id. ¶ 50.)

Dr. Zardouz's expert opinion does not create a genuine issue of material fact as to whether Dr. Patel was deliberately indifferent to Plaintiff's serious medical needs.  Indeed, Dr. Zardouz's report does not attribute any fault to the specific treatment provided by Dr. Patel, and it does not identify any specific date or timeframe during which Plaintiff failed to receive timely treatment.  Furthermore, Dr. Zardouz does not identify any different course of treatment that would have been appropriate.

Based on the undisputed facts, outlined above, Dr. Patel provided clinical treatment on several occasions, which included ordering Plaintiff's transportation to the hospital, medical treatment, housing accommodation, and diagnostic studies.  There is insufficient evidence to demonstrate that Dr. Patel disregarded an excessive risk to Plaintiff's serious medical needs.

Plaintiff argues that Dr. Patel was deliberately indifferent because there are no records that nursing staff conducted the ordered checks on August 31, 2014.  While there is a lack of such records, it is immaterial because there is no vicarious liability under 42 U.S.C. § 1983.  Palmer v. Sanderson, 9 F.3d 1433, 1437-38 (9th Cir. 1993).  Plaintiff presents no evidence that Dr. Patel was aware that

---

[7] Dr. Steven McIntire, graduated from Harvard Medical School in 1992, and he holds doctorate degrees in medicine and neuroscience.  (McIntire Decl. ¶ 1; ECF No. 50-3.)  He is currently a practicing neurologist and a Clinical Associate Professor of the Department of Neurology at Stanford University Medical Center.  (Id.)

nursing staff failed to follow his ordered checks. In fact, Dr. Patel declares that if Plaintiff was seen by a nurse who believed his symptoms had not stabilized or worsened, then the nurse would inform him or another physician who would then evaluate a further plan. (Patel Decl. ¶ 16.) Plaintiff presents no evidence to contradict Dr. Patel's declaration, and it was reasonable for Dr. Patel to believe his orders would be followed.

Plaintiff further argues that after he returned from his second trip to the hospital on September 4, 2014, his symptoms continued from September 5 through 9, 2014, and he did not receive medication or treatment. Plaintiff overlooks the testing and evaluations conducted at the hospital on September 1, 2014, which showed Plaintiff had a mild hemorrhagic contusion in the left frontal lobe at the site of laceration. There was no fracture. There was no epidural or subdural hematoma. On September 2, 2014, the findings showed improvement with residual subarachnoid hemorrhage and contusion. There was no new bleeding. The physicians then cleared Plaintiff to return to prison. (Patel Decl. ¶ 22; Patel Ex. A at pp. 1044-1046.) Upon Plaintiff's return to the prison, nursing staff evaluated Plaintiff and was diagnosed with post concussive syndrome, and ordered to be seen by a doctor within three to five days. (Patel Decl. ¶ 23, Patel Dep. at 51:19-52:16; Pl.'s Ex. 88.) Pursuant to policy and practice, inmates who return from the hospital are seen by medical staff for a follow-up appointment within three to five days. This is independent from the routine request for medical services procedures that inmates may use within their housing units. (Patel Decl. ¶ 25.) Plaintiff was evaluated by a nurse on September 8, 2014, and it was noted that he was he stated he was not provided pain medication. (Patel Decl. ¶ 27; Patel Ex. A at p. AGO 870.) However, Dr. Patel did not examine Plaintiff on this date and there is no evidence to demonstrate that Plaintiff's medical condition posed an excessive risk to his health. Further, even assuming a serious medical condition was present, there is no evidence that Dr. Patel was aware of any serious medical risk to Plaintiff's health.

Plaintiff also argues that after his appointment with Dr. Patel on September 10, 2014, he did not receive his medication until September 15, 2014. However, there is no evidence that Dr. Patel delayed, interfered or otherwise prevented Plaintiff from receiving his medication as ordered. See, e.g., Walker v. Benjamin, 293 F.3d 1030, 1038 (7th Cir. 2002) (doctor entitled to summary judgment where plaintiff claimed not to have received antibiotics the doctor prescribed for him but failed to

produce any evidence showing that failure was in any way within that doctor's control). Indeed, it is undisputed that Dr. Patel ordered medications, ordered a lay-in for ten days, ordered the staples be removed by nursing staff, and ordered another follow-up appointment in ten days. (Patel Decl. ¶¶ 33-35; Patel Ex. A at pp. AGO 803-804, 868.) Thus, Dr. Patel's actions do not demonstrate deliberate indifference.

Plaintiff further contends that he submitted four to five requests for medical services that went unanswered. However, there is no evidence of such requests in the medical records. (Johal Decl. ¶ 8.) Nonetheless, even if such evidence existed, nursing staff review such requests (Patel Decl. ¶¶ 4-5), and there is no evidence that Dr. Patel was aware or responsible for such requests.

Lastly, Plaintiff contends that Dr. Patel told him he was lying about his symptoms and making a big deal out of nothing. Dr. Patel declares that he never refused or delayed treatment for Plaintiff and he was at all times motived by his professional responsibility and a genuine concern for Plaintiff's health and well-being. (Patel Decl. ¶¶ 45-47.) Even assuming Plaintiff's version as the truth, such statements do not show that Dr. Patel was deliberately indifferent to Plaintiff's medical condition given the treatment he provided as outlined above. In addition, while the statement may have been offensive, inappropriate, or unprofessional, Plaintiff has failed to demonstrate that the actions taken by Dr. Patel in diagnosing and treating him were medically unsupported or were done with deliberate indifference. See, e.g., Jio v. Nolen, No. 08-cv-358, 2009 WL 175844, at *5 (E.D. Tex. Jan. 23, 2009) (doctor's "verbal expression of frustration over the fact that [patient[ complained of chest pain but repeated tests had shown nothing is not a constitutional violation in light of the fact that by his actions, [the doctor] showed that he was not deliberately indifferent to [patient's] medical needs"); cf. Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) ("verbal harassment or abuse … is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983). Furthermore, Plaintiff's disagreement with the type of care he was provided does not amount to deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (a mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference under the Eighth Amendment).

When viewed as a whole, there is no dispute of material fact as to whether Dr. Patel acted with deliberate indifference to Plaintiff's medical needs.

2.    Defendant Dr. Johal

It is undisputed that Plaintiff presented to Dr. Johal on October 1, 2014.  Plaintiff reported that he was having headaches, nausea, and vomiting.  (Johal Decl. ¶ 10; Johal Ex. A at p. AGO 864.)  Dr. Johal conducted a clinical evaluation of Plaintiff and analyzed his medical history.  Dr. Johal's assessment was that Plaintiff most likely had migraine headaches.  Dr. Johal advised Plaintiff to take ibuprofen for his headaches and ordered a follow-up appointment in two weeks to check on his symptoms.  (Johal Decl. ¶¶ 10-11; Johal Ex. A at pp. AGO 799-800, 864.)

Plaintiff had a possible seizure a few days later on October 5, 2014.  He was ordered to be transported to the San Joaquin Community Hospital by a non-party nurse practitioner.  (Johal Decl. ¶ 12; Johal Ex. A at pp. AGO 798, 861-863.)  Plaintiff stayed at the hospital from October 5 to October 8, 2014.  While there, he had CT scans of his brain and neck.  He also had electroencephalography (EEG) testing and magnetic resonance imaging (MRI), and was evaluated by neurologists.  All of Plaintiff's diagnostic tests were normal.  (Johal Decl. ¶¶ 12-13; Johal Ex. A at pp. AGO 990-991, 992-999, 1000-1003, 1012-1015, 1023-1026, 1028.)

Upon his return to Wasco, Plaintiff was evaluated by a nurse.  Dr. Patel, who was the on-call physician, also ordered medications for Plaintiff, including for seizures.  (Johal Decl. ¶ 14, Patel Decl. ¶ 42; Johal Ex. A at pp. AGO 797, 859.)  Plaintiff presented to Dr. Johal on October 13, 2014.  He complained of headaches, nausea and vomiting.  Plaintiff was not taking his medication as recommended.  (Johal Decl. ¶¶ 15-16; Johal Ex. A at p. AGO 857.)

Dr. Johal restarted Plaintiff's medications for seizures and started him on a new medication for his headaches.  Dr. Johal also ordered a liver function test.  (Johal Decl. ¶ 16; Johal Ex. A at pp. AGO 795, 857.)

On November 4, 2014, Dr. Johal updated Plaintiff's medications.  (Johal Decl. ¶ 17; Johal Ex. A at p. AGO 892.)

Plaintiff presented to Dr. Johal for another appointment on November 7, 2014.  Plaintiff continued to complain of throbbing headaches aggravated with light and dizziness while walking and in bed.  (Johal Decl. ¶ 18; Johal Ex. A at AGO 856; Johal Dep. at 121:22-122:6.)  Dr. Johal conducted a clinical evaluation and an orthostatic examination.  She noted his diagnostic testing history and

medication history. She then ordered medication and submitted a request for a specialty consultation with a neurologist. (Johal Decl. ¶¶ 18-19; Johal Ex. A at pp. AGO 790-791, 856, 956.)

On December 30, 2014, Dr. Johal updated Plaintiff's medications. (Johal Decl. ¶ 20; Johal Ex. A at p. AGO 789.)

Plaintiff presented to Dr. Johal for another appointment on January 6, 2015. He complained that he was having headaches and on-and-off nausea. He said that his dizziness was getting better. He denied any new symptoms. He was not taking some of his medications on a daily basis. (Johal Decl. ¶ 21; Johal Ex. A at p. AGO 855.) Dr. Johal conducted a clinical evaluation and analyzed his medical history. She adjusted Plaintiff's medications, ordered laboratory testing, and ordered another follow-up with a neurologist. (Johal Decl. ¶¶ 21-22; Johal Ex. A at pp. AGO 788, 855.) As of January 6, 2015, Plaintiff had not yet had his neurological consult that was recommended on November 7, 2014. (Johal Dep. at 94:24-95:22.)

Plaintiff was evaluated via teleconference by a neurologist on January 21, 2015. The neurologist recommended stopping one of Plaintiff's medications and continuing another, and advised Plaintiff to keep a diary of his headaches. (Johal Decl. ¶ 23; Johal Ex. A at pp. AGO 957-959.) Dr. Johal adopted the neurologist's recommendations on January 26, 2015, and ordered a follow-up evaluation with Plaintiff in one month. (Johal Decl. ¶ 24; Johal Ex. A at p. AGO 787.)

Plaintiff presented to Dr. Johal for another appointment on January 28, 2015. He complained that he continued to have on-and-off headaches that got worse when he was pushing and pulling heavy things. (Johal Decl. ¶ 25; Johal Ex. A at p. AGO 854.) Dr. Johal conducted a clinical evaluation, including questioning whether he had syncope, i.e. lightheadedness, and analyzed Plaintiff's medical history. Dr. Johal continued his medications, ordered a follow-up for another consultation with a neurologist, and entered a limited-duty accommodation chrono. (Johal Decl. ¶¶ 25-26; Johal Ex. A at pp. AGO 785-786, 854; Johal Dep. at 129:13-130:16.)

Plaintiff met again with the neurologist a second time, via teleconference on March 2, 2015. The neurologist noted that Plaintiff was not keeping the diary of his headaches and that he was not taking some of his medications. The neurologist noted that Plaintiff had not had any blackouts since October 2014, and that even was likely either an episode of syncope (fainting) or a seizure. The

neurologist recommended a referral to a psychologist. (Johal Decl. ¶ 27; Johal Ex. A at pp. AGO 954-955.)

On March 5, 2015, Dr. Johal ordered Plaintiff to have a follow-up appointment within two weeks and to schedule a follow-up visit with the neurologist in six weeks.

Plaintiff presented to Dr. Johal for another appointment on March 9, 2015. He complained that he was experiencing headaches in the morning and primarily when he worked in the kitchen. He was refusing to take his chronic pain medications. (Johal Decl. ¶ 29; Johal Ex. A at p. AGO 853.) Dr. Johal conducted a clinical evaluation and analyzed Plaintiff's medical history. She also adjusted his medication and prescribed new medication for his headaches. She also made referral for a psychological evaluation and for an optometry appointment. (Johal Decl. ¶¶ 29-30; Johal Ex. A at pp. AGO 782-783, 853.)

On March 11, 2015, Plaintiff blacked out in the kitchen at Wasco State Prison and was found lying on the floor. Plaintiff suffered a syncopal episode. Plaintiff told nursing staff that he had stopped taking medications two weeks earlier and that he did not drink any water that day. (Johal Decl. ¶ 31; Johal Ex. A at pp. AGO 849-850; Johal Dep. at 99:14-100:1; 133:20-134:4.) Prior to August 31, 2014, Plaintiff did not have a history of black outs or syncopal episodes. (Johal Dep. at 86:5-6.)

Dr. Patel, the on-call physician that day, ordered Plaintiff's transportation to the San Joaquin Community Hospital. (Johal Decl. ¶ 31; Patel Decl. ¶ 43; Johal Ex. A at pp. AGO 781, 849, 953.) Plaintiff stayed at the hospital until March 13, 2015. He had repeated CT, MRI, carotid duplex ultrasound (US Carotid Duplex) testing done. He also had a neurology consultation. All of his scans were normal. (Johal Decl. ¶ 32; Johal Ex. A at pp. AGO 974, 979-987.) Upon Plaintiff's return, a non-party physician ordered medication for his seizures and follow-up appointments with his primary physician and neurologist. (Johal Decl. ¶ 33; Johal Ex. A at p. AGO 780.)

Plaintiff presented to Dr. Johal for a follow-up appointment on March 17, 2015. He reported that he was feeling good. He denied headaches and dizziness. (Johal Decl. ¶ 34; Johal Ex. A at p. AGO 844.) Dr. Johal's assessment was that Plaintiff had a syncopal episode (fainting) and migraines.

She adjusted his medication and started him on a new prescription for his migraines. She further ordered a follow-up neurology consultation. (Johal Decl. ¶ 35; Johal Ex. A at pp. 778-779, 844.)

Dr. Johal was not responsible for Plaintiff's further treatment after his clinical visit on March 17, 2015. (Johal Decl. ¶ 36.)

Plaintiff contends that Dr. Johal was deliberately indifferent because she repeatedly failed to provide proper medical treatment and told him to stop coming to medical. Plaintiff submits that Dr. Johal's treatment was "so cursory as to amount to no treatment at all." (Pl. Opp'n at 22.) Plaintiff argues that Dr. Johal was deliberately indifferent because she only prescribed ibuprofen after the visit on October 1, 2014, and she did not refer him to a neurologist until November 7, 2014. Plaintiff also faults Dr. Johal for stating that Plaintiff complained of a new symptom of dizziness during the visit on November 7,2 014, which equates to ignoring his post-concussive symptoms. Plaintiff also takes issue and faults Dr. Johal because he eventually saw a neurologist remotely by telemedicine and not in person. Lastly, Plaintiff argues that Dr. Johal failed to order a more extensive EEG examination after considering whether he had syncope.

Plaintiff submits the declaration and medical evaluation by Dr. Zardouz who opines as follows:

This is an addendum to my recent Neurological Independent Medical Evaluation report dated October 26, 2018. I have received the five-page Declaration by Hwa Sung Sim, which more specifically describes his medical condition.

Based on the information in this Declaration, it is clear that Mr. Sim had a contusion to the brain on August 31, 2014. On that day, he was transported to Kern Medical Center, where he was evaluated, but a CT scan or an MRI scan of the brain was not performed. (Per the patient's history to me and the above medical records, staples were applied to the wound on his head, and then he was discharged.)

When the patient returned to the prison, he was not kept in the CDC unit where injured prisoners are kept for observation.

I should state that as a general rule, when a patient has a head injury, it can be called a minimal traumatic brain injury, concussion/contusion, or some other synonymous terminology. These patients need to be observed every four to six hours for at least the first 24 hours after the head injury to be certain there is no change in their mental status. This was not done in Mr. Sim's case.

Per the patient's Declaration, the next day, September 1, 2014, he continued to be symptomatic while in his cell, including vomiting in his bed and blood oozing from his scalp, as well as

24

headaches, dizziness and nausea. Therefore, he was transported to San Joaquin Community Hospital. (Per the medical records, he underwent the first CT scan of his brain on this date, and it showed abnormal findings.)

As the patient stated in his Declaration, he was still symptomatic when he returned to Wasco State Prison on September 4, 2014, but he was not examined by a doctor, and he did not receive any medication. He remained symptomatic.

It was not until September 10, 2014, that the patient was seen by a doctor in the prison. The patient was told by doctor in the prison. The patient was told by the doctor that he was "making a big deal out of nothing" and that nothing was wrong with him (as noted on Page 3 of the Declaration). Therefore, he was not given any medication on this date.

The patient was seen by a doctor again on September 19, 2014. However, he was again told that he was "making a big deal out of nothing." (as noted on Page 3 of the Declaration).

On October 1, 2014, the patient was seen by Dr. Johal due to his ongoing complaints of headaches, dizziness, nausea and vomiting. The patient was also told by Dr. Johal that there was nothing wrong with him (as noted on Page 4 of the Declaration).

Needless to say, when there is a history of concussion/contusion, patients remain symptomatic for at least one to three months and sometimes longer.

In this particular case, I can state that Mr. Sim did not receive medical care in a timely manner.

Finally, I should state that patients, such as Mr. Sim, with a history of concussion/contusion have a chance of developing neurological issues in the future, such as mood changes and sleep problems. There is also a small percentage of patients who develop seizures and/or memory issues. In the event that patients develop any of these symptoms, they require follow-up neurological assessments and testings, and at times they require more specific treatment depending on the type of symptoms they have developed.

(Pl.'s Opp'n, Ex. 87.)

In his initial report, Dr. Zardouz discussed his in-person medical examination of Plaintiff. (ECF No. 51-30 at pp. 1-9.) The medical examination also included statements by Plaintiff regarding the events at issue in this action. (Id. at pp. 2-4.) It also discussed Defendants' expert Dr. McIntire's report and a review of the medical records. (Id. at pp. 9-19.) Dr. Zardouz then provides his impression and conclusion. (Id. at pp. 19-21.) However, nowhere in Dr. Zardouz's initial report does he opine that Plaintiff did not receive medical care in a timely manner. Rather, Dr. Zardouz's opinion is made in an addendum and only after he reviewed Plaintiff's declaration submitted in opposition to Defendants' motion for summary judgment.

25

Defendants present the expert opinion of Dr. Steven McIntire, who conducted a medical interview and evaluation of Plaintiff, reviewed his medical records and history, and opined that there was not support for the finding that Drs. Patel and Johal were deliberately indifferent to Plaintiff's serious medical needs following the injury on August 31, 2014. (McIntire Decl. ¶ 49; ECF No. 50-3.) Dr. McIntire further opined that the medical treatment Plaintiff received for his injury was appropriate and consistent with the accepted standard of care for such a head injury and associated neurological symptoms. (Id. ¶ 50.)

Dr. Zardouz's expert opinion does not create a genuine issue of material fact as to whether Dr. Patel was deliberately indifferent to Plaintiff's serious medical needs. Indeed, Dr. Zardouz's report does not attribute any fault to the specific treatment provided by Dr. Johal, and it does not identify any specific date or timeframe during which Plaintiff failed to receive timely treatment. Furthermore, Dr. Zardouz does not identify any different course of treatment that would have been appropriate.

Based on the undisputed facts, outlined above, Dr. Johal provided clinical treatment on several occasions, which included ordering and adjusting medications, ordering follow-up appointments, ordering laboratory tests, and requesting consulting with neurologists, a psychologist, and an optometrist. There is insufficient evidence to demonstrate that Dr. Johal disregarded an excessive risk to Plaintiff's serious medical needs.

At the October 1, 2014, examination, Dr. Johal considered the most recent CT scan which was normal, along with Plaintiff's complaints of headaches, nausea, and vomiting. (Johal Decl. ¶ 10; Johal Ex. A at p. AGO 864.) Dr. Johal's clinical assessment was that Plaintiff was most likely suffering migraines. (Johal Decl. ¶11; Johal Ex. A at pp. AGO 799-800, 864.) Dr. Johal ordered a pain reliever and scheduled a follow-up appointment. (Id.) There is no evidence that Dr. Johal was deliberately indifferent by not requesting a neurology specialty consultation in light of his normal CT scan a week earlier. In addition, there is no evidence that Dr. Johal's treatment was medically unacceptable under the circumstances, or that she chose such course of treatment in conscious disregard of an excessive risk to Plaintiff's health.

On October 5, 2014, Plaintiff suffered a possible seizure and was sent to the hospital and returned on October 8, 2014. (Johal Decl. ¶ 12; Johal Ex. A at pp. AGO 798, 861-863.) At the

26

hospital, multiple CT scans of Plaintiff's brain and neck, an EEG test, an MRI, and a consultation with a neurologist were conducted. (Johal Decl. ¶¶ 12-13; Johal Ex. A at pp. AGO 990-991, 992-999, 1000-1003, 1012-1015, 1023-1026, 1028.) All of the diagnostic tests were normal. (Id.)

Plaintiff's argument that Dr. Johal was deliberately indifferent for failing to refer him to a neurologist until November 7, 2014, due to complaints of dizziness, even though he had previously presented complaints of dizziness, is not supported by the record and does not demonstrate deliberate indifference. The record demonstrates that Dr. Johal's declaration and treatment notes reflect Plaintiff's history of dizziness. (Johal Decl. ¶¶ 18-19; AGO 856.) At her deposition, Dr. Johal explained in response to the question why she recommended Plaintiff see a neurologist despite the negative results of the EEG, CT, and MRI, she stated, "Now he has new symptoms of dizziness, so I thought let's get [a] third opinion just to be on the safe side, but there was nothing." (Johal Dep. at 122:24-123:1.) The dizziness symptoms were "new" from the most recent diagnostic studies. Furthermore, there is no competent evidence to demonstrate that Dr. Johal's treatment was medically unacceptable or chosen in conscious disregard of an excessive risk to Plaintiff's health. Moreover, Plaintiff's argument amounts to nothing more than negligence, if any, which is insufficient under the Eighth Amendment.

Further, Plaintiff's argument that Dr. Johal was deliberately indifferent because consultations with Dr. Malholtra, the neurologist, were conducted by telemedicine rather than in-person, is without merit. Contrary to Plaintiff's argument that the examinations by telemedicine were cursory, the medical records reflect that Dr. Malholtra considered all of the circumstances surrounding Plaintiff's medical condition in rendering the opinions and recommendations for treatment. (Johal Decl. Exs. AGO 954-955, 957-959.) Further, "[t]he practice of 'telemedicine'—i.e., 'health care delivery, diagnosis, consultation, treatment, transfer of medical data, and education using interactive audio, video, or data communications'—is specifically authorized by the Telemedicine Development Act of 1996 (Bus. & Prof. Code, § 2290.5, subd. (a)(1).)" Hageseth v. Superior Court, 150 Cal.App.4th 1399, 1424 (Cal. App. 2007).

In addition, Plaintiff's claim that a longer EEG recording should have been ordered, misstates the report by his expert witness. Dr. Zardouz's report states that, "At this time, I recommend that the

patient undergo a longer EEG recording . . . to find out if there are any abnormal brain discharges."
(Zardouz Report at 21, ECF No. 51-30.)  Thus, the report does not state that a longer EEG recording
should have been ordered by Dr. Johal.  Plaintiff has not produced evidence that the treatment
provided by Dr. Johal's was medically unacceptable under the circumstances, or that she chose the
course of treatment in conscious disregard to an excessive risk to Plaintiff's health.  Accordingly, Dr.
Johal is entitled to summary judgment.[8]

## IV.

## ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      Defendants Drs. Patel and Johal's motion for summary judgment is granted;

2.      The Clerk of Court shall enter judgment in favor of Defendants Patel and Johal;

3.      This action shall proceed to trial on Plaintiff's excessive force claim against Defendant
         Duran; and

4.      By way of separate order, the Court will set this matter for a telephonic trial scheduling
         conference.

IT IS SO ORDERED.

Dated:   **February 15, 2019**

_____
UNITED STATES MAGISTRATE JUDGE

---

[8] Because the Court finds that Defendants are entitled to summary judgment on the merits of Plaintiff's deliberate
indifference claims, the Court need not reach Defendants' alternative argument for entitled to qualified immunity.